**STATE of Missouri,**
**Respondent/Cross–Appellant,**

v.

**Vincent P. WAHBY,**
**Appellant/Cross–Respondent.**

Nos. 70508, 70509.

Supreme Court of Missouri,
En Banc.

Aug. 9, 1989.

148

Dennis J. Myers, St. Louis, for respondent/cross–appellant.

William L. Webster, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for appellant/cross–respondent.

HIGGINS, Judge.

Vincent P. Wahby was charged with acceding to corruption (Count I), two counts of failure to execute a warrant (Counts II and III), conspiracy to steal over $150 by coercion (Count IV), and 12 counts of unlawful transfer of a firearm (Counts V through XVI). The jury found Wahby guilty on Counts I through XII, and not guilty on Counts XIII through XVI. In response to Wahby's motion for a new trial, the trial court ordered the verdict on Count I set aside and dismissed the charge. The State appeals that order. Wahby appeals his conviction on Counts II through XII. He alleges: 1) his actions, as proven by the State, do not constitute the crime of unlawful transfer of a firearm as charged in Counts V through XII; 2) multiple firearm charges (Counts V through XII) based on a single transaction violate due process and the double jeopardy clause of the fifth amendment; 3) the State failed to prove that he had a duty to execute a warrant (Counts II and III); 4) the State failed to prove a threat to take or withhold action as a public servant as an element of the conspiracy charge (Count IV); and, 5) a tape recording relating to the conspiracy charge was improperly admitted into evidence. This Court accepted transfer from the Court of Appeals, Eastern District, under Rule 83.02, and consolidated the appeals. The judgment is affirmed with respect to Counts II through IV and reversed with respect to Counts V through XII. The circuit court's order setting aside the jury verdict and dismissing Count I is vacated, and the cause remanded for further proceedings consistent with this opinion.

Vincent P. Wahby became the Marshal of the Court of Appeals, Eastern District, in September 1985. Among his duties was the supervision of convicted individuals free on appeal bond under the jurisdiction of the Eastern District. Incident to this duty, he was to prepare an arrest warrant for those under his supervision whose convictions were affirmed on appeal and send a copy of the court's mandate to the Department of Corrections and Human Resources.

Larry Sutton was one of the individuals free on appeal bond when Wahby assumed his duties as marshal. Sutton was required to report to the marshal once a month. On October 22, 1985, Sutton's conviction for stealing over $150 was affirmed. Wahby prepared a warrant for his arrest which was signed and issued by the chief judge. Sutton's lawyer asked the court to revoke the warrant so that Sutton could remain free pending his decision whether a motion for rehearing or transfer would be filed. The court revoked the warrant. Sutton's lawyer decided not to file any motions, and the court issued its mandate on November 12, 1985. At that time, Sutton was advised to surrender himself.

Sutton reported to Wahby and asked him if he should turn himself in. Wahby said no, and put Sutton in touch with a new lawyer, Robert Hampe. Wahby told Sutton that Hampe would be able to get his conviction reversed. Sutton paid Hampe $750 and was told that motions would be filed when the trial judge in Sutton's case

"cooled off." In the meantime, Sutton, Hampe and Wahby discussed "burying" Sutton's file in the archives. Wahby later assured Sutton that his file was indeed buried.

In about March 1986, Sutton started dating Maureen Johnson. In August 1986, Sutton told her that Wahby wanted to have sex with her in return for keeping Sutton out of jail. Wahby and Johnson subsequently had sexual relations.

In September 1986, Sutton went to work in Wahby's gun shop. He was not paid for his work; he testified at trial that he was returning a favor. In the course of his work, he met several of the judges from the Eastern District. Wahby instructed Sutton not to mention his conviction or appeal to any of the judges, and he complied.

In October, Wahby, Sutton and a third person went to a sheriff's auction. All three contributed money, and Wahby purchased three cartloads of guns (approximately 100 individual guns). The guns were taken to Wahby's gun shop. Beginning in November, Sutton took firearms from the shop on two or three occasions. He took a total of 12 guns, all of which were full-length rifles or shotguns purchased at the sheriff's auction. Wahby admitted "transferring" the guns to Sutton, and signed the federal firearm transaction records for those guns. Sutton testified that the dates on the records were falsified so that Wahby would not have to file additional federal reports indicating that Sutton had taken more than one gun in a single day.

During the time Sutton was free and working in the gun shop, Wahby met Marsha Fredrickson. She was free on appeal bond after a conviction for prostitution and reported to Wahby each month. Wahby suggested to Sutton that he try to get some money from her. Sutton subsequently met her and told her that if she did not pay money Wahby could use his influence to make sure her conviction was affirmed regardless of the merits of her appeal. Fredrickson called Wahby, and he indicated that Sutton's representations were true.

Wahby referred Fredrickson to Attorney Hampe who agreed to handle her appeal for $45,000. Fredrickson paid Hampe a total of $70,000 for representation in her pending appeal and another matter in federal court. After her conversation with Wahby, Fredrickson went to Wahby's gun shop on a number of occasions and dropped off a total of over $2,000 in cash. On three occasions, she gave the money directly to Sutton. Sutton let her overhear telephone conversations with Wahby that indicated he knew about the transactions. She left a fourth payment in a box in the restroom; Sutton testified that when he went to retrieve it, it was gone, presumably taken by Wahby.

During the time he was out of jail, Sutton made a series of tape recordings of his conversations with Wahby. He used a voice-activated recording device. The recordings were admittedly poor ones, but one was admitted over objection at trial upon Sutton's representation that it accurately reflected the conversation in which he took part.

Finally, in May 1987, a special agent with the Federal Bureau of Investigation attempted to locate Sutton. The FBI agent contacted the St. Louis County Police because it appeared to him that Sutton should have been in jail. A police detective in turn contacted Wahby and asked him to look into the matter. Wahby called the detective back and said there had been a mix-up; an arrest warrant should have been issued, and one would be issued.

Wahby prepared an arrest warrant on May 28, 1987, and the Honorable Robert O. Snyder signed it the same day. Because he failed to enter the warrant into a law enforcement computer network until June 2, Wahby was the only law enforcement officer who knew about the warrant in the intervening time. Wahby called Sutton at the gun shop on the 28th and told him to stay put. Sutton disappeared until June 16, when he surrendered to the police. On June 10, Judge Snyder questioned Wahby about Sutton, and Wahby admitted to giving Sutton a few days to clear out.

## I.

■ Wahby contends that the transfer of non-concealable weapons to a fugitive from justice is not a crime as defined in section 571.060, RSMo 1986:

1. A person commits the crime of unlawful transfer of weapons if he:

(1) Knowingly sells, leases, loans, gives away or delivers a firearm or ammunition for a firearm to any person who, under the provisions of section 571.-070, is not lawfully entitled to possess such[.]

Section 571.070 provides:

1. A person commits the crime of unlawful possession of a concealable firearm if he has any concealable firearm in his possession and:

(1) He has pled guilty to or has been convicted of a dangerous felony, as defined in section 556.061, RSMo, or of an attempt to commit a dangerous felony, or of a crime under the laws of any state or of the United States which, if committed within this state, would be a dangerous felony, or confined therefor in this state or elsewhere during the five-year period immediately preceding the date of such possession; or

(2) He is a fugitive from justice, is habitually in an intoxicated or drugged condition, or is currently adjudged mentally incompetent.

It is not disputed that Sutton is within the class of persons prohibited from possessing concealable firearms. It is also not disputed that the guns Wahby transferred to him were not "concealable firearms" as defined in section 571.010(2). Wahby contends that the above-quoted statutes are interdependent. Therefore, section 571.-060(1) prohibits the transfer of only concealable firearms to fugitives from justice. The State argues that the statute prohibits the transfer of all firearms and ammunition to a class, and section 571.070 is to be used only in defining that class.

The primary purpose of statutory construction is to ascertain the intent of the legislature, and to give effect to that intent. *State v. Patterson*, 729 S.W.2d 226 (Mo.App.1987). Legislative intent is to be determined, where possible, from the language of the statute itself, considering the words used in their plain and ordinary meaning. *State v. Sweeney*, 701 S.W.2d 420 (Mo. banc 1985). Any doubt as to the meaning of a criminal statute must be resolved in favor of the defendant. *State v. Hornbeck*, 707 S.W.2d 809 (Mo.App.1986).

Section 571.070 makes it a crime for dangerous felons, fugitives from justice, the habitually intoxicated or drugged and the mentally incompetent to possess concealable firearms. Section 571.060 prohibits the transfer of a firearm or ammunition "to any person who, under the provisions of section 571.070, is not lawfully entitled to possess such." Under the construction advanced by the State, section 571.060 would make it a crime to sell or transfer that which it is not a crime to possess. Although it is within the legislature's prerogative to enact a statute with that purpose, *see e.g.*, chapter 573, RSMo 1986, (sale, promotion, publication and public display of pornography made illegal), section 571.060 is not such a statute. The plain language of section 571.060 makes it a crime to transfer a firearm to a person not entitled to possess that firearm. Reference to section 571.070 provides not only the subclass of person, but also the subclass of firearm or ammunition subject to the prohibition.

The laws of sister states demonstrate the rationality of this construction. Twelve states' gun control laws criminalize the transfer or sale of concealable weapons to felons while allowing the sale of full-length rifles and shotguns. *See* Ala.Code § 13A–11–72(a) (1975); Alaska Stat. § 11.61.200(a)(2) (1983); Conn.Gen.Stat. § 29–33 (1989); Ind.Code Ann. § 35–47–2–7(1) (Burns 1985); Kan.Stat. Ann. § 21–4203(1)(c) (1988); Md.Ann.Code art. 27, § 445(b) (1987); Minn.Stat.Ann. § 624.7132 subds. 4, 15 (West 1987); N.C. Gen.Stat. § 14–402 (1988); Or.Rev.Stat. § 166.470 (1985); S.C.Code Ann. § 16–23–30(a) (Law. Co-op. 1976); Tenn. Code Ann. § 39–6–1704(b) (1982); Wash. Rev.Code Ann. § 9.41.080 (West 1988).

Because the statute does not proscribe the conduct charged, Wahby's convictions

on Counts V through XII, the firearms charges, must be reversed; the Court need not address the remaining contentions regarding those charges.

## II.

Wahby contends that his conviction for failing to execute the mandate of the court of appeals must be reversed because the State failed to prove that Wahby had the duty and authority to arrest Sutton by the terms of the mandate, that Wahby had the power to issue an arrest warrant, and that Wahby was a "law enforcement officer." This charge, Count II of the information, is premised on Wahby's failure to take any steps to arrest Sutton between November 12, 1985, and May 27, 1987.

■ Section 575.180(1) provides:

1. A law enforcement officer commits the crime of failure to execute an arrest warrant if, with the purpose of allowing any person charged with or convicted of a crime to escape, he fails to execute any arrest warrant, capias, or other lawful process ordering apprehension or confinement of such person, which he is authorized and required by law to execute.

A prerequisite to conviction under this statute, therefore, is that the defendant be a law enforcement officer. "Law enforcement officer" is defined in section 556.061(17) as "any public servant having both the power and duty to make arrests for violations of the law of this state." Section 547.330 gives the marshal of the court of appeals both the power and the duty to "arrest [a] convict, and deliver him to the proper official," upon the order of the court. The marshal of the court of appeals, therefore, is a law enforcement officer within the meaning of section 575.180.

■ Wahby cites a number of cases for the proposition that a mandate is an order directed to the trial court that, with limited exceptions, divests an appellate court of its jurisdiction over a case. *See, e.g., State v. Thompson*, 659 S.W.2d 766 (Mo. banc 1983); *Durwood v. Dubinsky*, 361 S.W.2d 779 (Mo.1962). From this, he argues that the mandate imposed no duty upon him to

arrest Sutton. None of the cited cases hold that the mandate's instructions are directed solely to the trial court. In any event, the State's proof showed that it is the marshal's duty to keep a copy of the mandate in his file, and send a copy to the Department of Corrections.

The mandate in Sutton's case recited: "It is further adjudged by the Court that the sentence pronounced against Larry Sutton be executed, and that Larry Sutton, having been found to be a prior offender, be committed to the Department of Corrections and Human Resources." The Honorable Kent Karohl of the Missouri Court of Appeals, Eastern District, testified that this document empowered the marshal to arrest the convict "by its terms." The jury was also entitled to find that the mandate put Wahby on notice that the appellate process was at an end and that he failed to prepare an arrest warrant for the chief judge's signature. There was no need for the State to prove that Wahby could himself issue an arrest warrant. In combination with the undisputed finding of intent to allow Sutton to remain free from lawful confinement, either the failure to arrest or the failure to procure a warrant supports a conviction on the offense charged.

## III.

Wahby contends that the trial court erred in overruling his motion for acquittal on Count III, the second count of failure to execute a warrant. This charge is premised on his failure to arrest Sutton upon the warrant issued May 28, 1987. Wahby contends again that he was not a law enforcement officer and, in addition, contends that the court of appeals was without jurisdiction to issue an arrest warrant for Larry Sutton on May 28, 1987, and he had no duty to execute an order that was extrajudicial and void. He also argues he had no opportunity to arrest Sutton.

■ As discussed above, the marshal of the court of appeals is a law enforcement officer within the meaning of section 575.180. As to his contention that the arrest warrant issued by the court of appeals

was a void order, section 542.020 authorizes the judges of the court of appeals, among others, to issue process for the apprehension of those charged with criminal offences. The only jurisdictional limitation on this authority is territorial. The judges of the Court of Appeals, Eastern District, therefore, may issue an arrest warrant at any time, anywhere in the Eastern District of Missouri, when it comes to their attention that a criminal or charged criminal suspect is at large. The warrant for Sutton's arrest, issued May 28, 1987, was a lawful order independent of the court's jurisdiction over the Sutton appeal. Wahby's contention that the State failed to prove he had an opportunity to arrest Sutton is refuted by his own admission to Judge Snyder that he gave Sutton a few days to "clear out."

### IV.

■ Wahby contends that the State failed to adduce evidence of a threat to take or withhold action as a public servant as an element of Count IV, conspiracy to steal over $150 by coercion.

To determine whether there is sufficient evidence to support a conviction, an appellate court "must accept the state's evidence as true and give the state the benefit of all reasonable inferences, disregarding all evidence and inferences to the contrary." *State v. Meyer,* 694 S.W.2d 853, 855 (Mo.App.1985). The reviewing court must determine "whether there was sufficient evidence from which reasonable persons could have found the defendant guilty as charged." *State v. Dunavant,* 674 S.W.2d 685 (Mo.App.1984).

Wahby was charged with conspiracy to steal over $150 by coercion. The statute defines "coercion" as "a threat, however communicated ... to take or withhold action as a public servant." § 570.010(3), RSMo 1986. The evidence showed that Marsha Fredrickson knew Wahby in his capacity as marshal of the court of appeals; that Larry Sutton told Fredrickson that unless she paid him money, Wahby would make sure her conviction was affirmed regardless of the merits of her appeal; that

Sutton told Fredrickson Wahby had the power to keep a convict from being arrested and had exercised it on Sutton's behalf; and that Wahby assured Fredrickson that Sutton's representations were true. A jury could reasonably find from this evidence that a threat to take or withhold action as a public servant was communicated to Marsha Fredrickson.

### V.

Wahby contends the trial court erred in admitting a tape recording made by Sutton, in allowing the jury to read a transcript of the recording, and in expressing an opinion as to the accuracy of the transcript.

■ A trial court has broad discretion in determining the admissibility of evidence, and its determination will not be disturbed on appeal absent a clear abuse of discretion. *State v. Clark,* 711 S.W.2d 928, 932 (Mo.App.1986). A proper foundation for the admission of a sound recording consists of:

(1) A showing that the recording device was capable of taking testimony, (2) a showing that the operator of the device was competent, (3) establishment of the authenticity and correctness of the recording, (4) a showing that changes, additions, or deletions have not been made, (5) a showing of the manner of the preservation of the recording, (6) identification of the speakers, and (7) a showing that the testimony elicited was voluntarily made without any kind of inducement.

*State v. Spica,* 389 S.W.2d 35, 44 (Mo. 1965), *cert. denied,* 383 U.S. 972, 86 S.Ct. 1277, 16 L.Ed.2d 312 (1966). Wahby asserts that none of the first five requirements were met.

■ The court held a hearing on Wahby's motion to suppress the recording. Sutton testified that his tape recorder was capable of recording and that he had successfully recorded conversations on this and other occasions. Generally, the existence of a tape recording satisfies the first element of *Spica. See State v. Settle,* 670 S.W.2d 7 (Mo.App.1984); *and see U.S. v. Moss,* 591 F.2d 428 (8th Cir.1979). Sutton testified that he knew how to operate the

recorder. This, taken with the successful making of a recording satisfies the second element. *See U.S. v. McCowan,* 706 F.2d 863 (8th Cir.1983). Sutton testified that he had listened to the tape the night he made it and again prior to trial and that it was an accurate recording of the conversation that took place. Sutton testified that neither he nor anyone else made any additions or deletions to the tape. With respect to the fifth element, Sutton testified that the tape he listened to prior to the hearing was the tape he had made, and it accurately reflected the conversation that took place. Positive identification of a tape recording renders the chain of custody issue moot. *State v. Follins,* 672 S.W.2d 167 (Mo.App. 1984).

The State laid a proper foundation for admission of the tape, and Wahby had an opportunity to attack credibility of Sutton and his tape before the jury. The trial court did not abuse its discretion in admitting it.

■ A transcript of the tape, not admitted into evidence, was given to the jurors to aid them in following the tape. The court properly instructed that the tape, not the transcript, was the evidence and that in case of disagreement between the transcript and their hearing of the tape their hearing was to control. The use of such a transcript has been approved by this Court as not violative of the best evidence rule and has been committed to the discretion of the trial court. *State v. Engleman,* 634 S.W.2d 466 (Mo.1982). The trial court here did not abuse its discretion in allowing the jury to read the transcript while the tape was played as an aid to understanding.

### VI.

■ Wahby contends the trial judge involved himself in the trial by giving an opinion as to the accuracy of the transcription of the tape. In his instruction to the jury regarding the use of the transcript, the trial judge said:

in any instance where your ear disagrees with the transcript, your ear controls. So, if there are any errors in the transcript, *and there are a couple that I have detected which are of a minor transposition of words,* but regardless of the nature of the difference between that of the transcript and the tape recording, the tape recording and your understanding of the tape recording is what controls.

Wahby argues that this constituted a tacit, prejudicial endorsement of the transcript as substantially accurate. To the contrary, this statement is a clear admonition to listen carefully because the transcript might not be accurate.

■ Wahby also argues that because the court reporter was unable to transcribe the tape as it was being played he is deprived of a full review on appeal. This Court accepted the tape itself as a supplement to the legal file, and it has been available for this review.

### VII.

The State contends on cross appeal that the trial court erred in setting aside the jury's verdict on Count I of the information, acceding to corruption, and in dismissing the charge on the ground the evidence was insufficient to support a conviction on Count I as a matter of law. Wahby contends that the evidence supported reasonable hypotheses of his innocence, therefore, the court correctly set aside the verdict. In the alternative, he contends that prosecution for both Counts I and II constitutes double jeopardy.

### A.

■ In a determination of the sufficiency of the evidence to support a conviction, all evidence tending to support the verdict must be considered as true, contrary evidence disregarded, and every reasonable inference supporting the verdict indulged. Where the conviction rests on circumstantial evidence alone, the facts and circumstances to establish guilt must be consistent with each other, consistent with the guilt of the defendant, and inconsistent with any reasonable theory of his innocence. The evidence need not be conclusive

of guilt, nor must the evidence demonstrate the impossibility of innocence. *State v. Franco*, 544 S.W.2d 533, 534 (Mo. banc 1977).

 Viewed in this light, the evidence, direct and circumstantial, demonstrates a submissible case:

Wahby was a public servant in his capacity as marshal of the court of appeals. Contrary to his legal duty, he failed to take steps to effectuate or cause the arrest of Larry Sutton. While Larry Sutton was free, Wahby asked him to work in his gun shop without pay. Wahby instructed Sutton to do as he was told once Sutton became aware that his case file had been "buried" in the archive. Sutton understood he was returning a favor by working in the gun shop. On one occasion, Wahby used the threat of sending Sutton to jail to procure a sexual liaison with Sutton's girlfriend. Taken together, these facts and circumstances are consistent with Wahby's guilt on the charge of acceding to corruption, and inconsistent with any reasonable theory of his innocence.

### B.

 The Fifth Amendment to the United States Constitution provides "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb."

In the recent case, *Missouri v. Hunter*, 459 U.S. 359, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983), the Supreme Court determined that where the legislature has adopted discrete statutes defining crimes that the legislature intended be separately punishable, the separate charges may be tried in one proceeding before the same court or jury irrespective whether the separate charges each contain identical elements. *Hunter*, pp. 365–369, 103 S.Ct. pp. 677–679.

Nevertheless, the parties join issue here to argue whether the crimes in question contain the same elements (Wahby) or separate elements (State). Suffice to say on this argument that each charge required proof of an element not required by the other, and prosecution for both does not constitute double jeopardy. The crime of

acceding to corruption required proof that Wahby received a benefit in return for violation of a known legal duty as a public servant. § 576.020.1(2), RSMo 1986. The crime of failure to execute a warrant required proof that Wahby acted with the purpose of allowing Sutton to escape lawful confinement. § 575.180, RSMo 1986. *State v. Bowles*, 754 S.W.2d 902 (Mo.App. 1988); *State v. Lulkowski*, 721 S.W.2d 35 (Mo.App.1986).

Accordingly, the judgment of conviction is reversed with respect to Counts V through XII, affirmed with respect to Counts I through IV, and the order setting aside the jury verdict and dismissing Count I is vacated. The cause is remanded for reinstatement of the charge, the verdict, and sentencing on Count I.

All concur.